IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | |
|---|---|
| DEBBIE L. SIMPSON, | ) Civil Action No. 3:03-3538-CMC-JRM |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| UNITED PARCEL SERVICE COMPANY, | ) |
| | ) **REPORT AND RECOMMENDATION** |
| Defendant. | ) |
| | ) |

Plaintiff, Debbie Simpson ("Simpson"), filed this action on November 7, 2003. She

alleges claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e

et seq. ("Title VII").[1] Additionally, she appears to allege a claim under South Carolina law for

wrongful termination/breach of contract. Complaint, at 7-8.[2] Defendant is United Parcel Service

Company ("UPSCO"). UPSCO filed a motion for summary judgment on November 30, 2004.

Simpson filed a memorandum in opposition to summary judgment on January 21, 2005. UPSCO

filed a reply on February 16, 2005.

---

[1]Pretrial matters in this case were referred to the undersigned pursuant to Rule 73.02(B)(2)(g),
DSC. Because this is a dispositive motion, this report and recommendation is entered for review
by the court.

[2]In its motion for summary judgment, UPSCO argues that this Court lacks subject matter
jurisdiction over Simpson's contractual wrongful termination claim because it is a "minor dispute"
preempted under the Railway Labor Act, 45 U.S.C. §§ 151, et seq. In her memorandum in
opposition to summary judgment, Simpson states that she is persuaded that the RLA preempts state
contract law and withdraws her wrongful termination claim under state law.

## SUMMARY JUDGMENT STANDARD

When no genuine issue of any material fact exists, summary judgment is appropriate. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. Id. Courts take special care when considering summary judgment in employment discrimination cases because states of mind and motives are often crucial issues. Ballinger v. North Carolina Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir.), cert. denied, 484 U.S. 897 (1987). This does not mean that summary judgment is never appropriate in these cases. To the contrary, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985).

In this case, defendant "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If defendant carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Moreover, "once the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir.

2

1992).  The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment.  Id. and Doyle v. Sentry Inc., 877 F. Supp. 1002, 1005 (E.D.Va. 1995).  Rather, the non-moving party is required to submit evidence of specific facts by way of affidavits (see Fed. R. Civ. P. 56(e)), depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial.  Baber, citing Celotex Corp., supra.  Moreover, the non-movant's proof must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits."  Mitchell v. Data General Corporation, 12 F.3d 1310, 1316 (4th Cir. 1993) and DeLeon v. St. Joseph Hospital, Inc., 871 F.2d 1229, 1233 (4th Cir. 1989), n.7.  Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment.  Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547 (5th Cir. 1987) and Evans v. Technologies Applications & Services Co., 80 F.3d 954 (4th Cir. 1996).


## FACTS

1.    UPSCO owns, operates, and maintains an air fleet utilized by United Parcel Service, Inc. ("UPS").  UPSCO is primarily responsible for shipping UPS parcels by air between airport hubs throughout the world.  Darrell Cryer Decl., Para. 4.

2.    Simpson began working for UPSCO as an aircraft mechanic in October 1988.  She worked in Louisville, Kentucky from October 1988 through 1994, and transferred to Reno, Nevada before being laid off in July 1995.  In July 1996, Simpson was recalled as an aircraft mechanic for UPSCO in the Columbia, South Carolina air gateway (the "Columbia Gateway").  Simpson I Dep.[3] 37-38, 57-59.

---

[3]Simpson was deposed over two days.  References to the first day of her deposition (June 28, (continued…)

3.    Simpson claims that there are few women in the traditionally male field of aviation mechanics and that there is an attitude by some men that "women don't belong in aviation."

4.    When Simpson began working at the Columbia Gateway, Adolph Garcia ("Garcia") was her supervisor.  Garcia was later transferred out of the Columbia Gateway and Tom Collette ("Collette") became Simpson's supervisor.  The Columbia Gateway later added a second supervisor, Jeff Moore ("Moore"), who became Simpson's primary supervisor. Simpson I Dep. 60, 65-66.  In July 2001, Rock Underwood ("Underwood"), mechanic at the Columbia Gateway, was promoted to a supervisor position.  In January 2002, Underwood moved to the night shift (Simpson has primarily worked on the night shift since approximately 2000) and became Simpson's primary supervisor.  Underwood Decl., Para. 2, 12; Simpson I Dep. 71-72 and 120.

5.    Moore and Underwood reported to Darrell "Skip" Cryer ("Cryer"), the Center Manager for the Southeast Aircraft Maintenance Division.  Cryer reported to John Field ("Field"), the Southeast Aircraft Maintenance Division Manager.  Cryer Decl., Paras. 2-3; Underwood Decl., Para. 2; Field Decl., Para. 3

6.    Simpson's responsibilities as a mechanic at the Columbia Gateway were to inspect airplanes, handle any mechanical issues that arose, and dispatch aircraft.  Simpson I Dep. 62; Underwood Decl. Para. 3.

---

[3](…continued)
2004) are referred to as "Simpson I Dep." and to the second day of her deposition (July 21, 2004) are referred to as "Simpson II Dep."

7.    Prompt delivery of packages is essential to the success of UPSCO and UPS, such that UPSCO places a heavy emphasis on getting flights out of the gateway and safely in the air on schedule.  Simpson I Dep. 42; Cryer Decl., Para. 4; Underwood Decl., Para. 4.

8.    On October 1, 1996, one of Simpson's fingers was cut off in an accident while she was doing maintenance on a plane at the Columbia Gateway.  Simpson I Dep. 196-197 and Ex. 51.

9.    In early 1999, Simpson was informed that she was required to attend training in December in Louisville, Kentucky.  Simpson I Dep. 125-127.  Several months prior to training, Simpson informed Moore that she did not intend to attend the training because it was not scheduled for a good time for her.  Id.  Moore told Simpson repeatedly that she had to provide a reason why she could not attend before he could excuse her from training, but she refused to provide any explanation beyond stating "it was personal."  Simpson I Dep. 126-130.  Prior to the training, Simpson received a letter from Jeff White, the Columbia Gateway Manager at the time, advising her that she was required to attend training, and that there would be serious consequences to her employment if she failed to do so without offering a basis on which she might be excused.  Simpson I Dep. 133-34 and Ex. 7.  Simpson refused to attend training and was issued a written warning as a result.  Simpson I Dep. 138 and Ex. 8.

10.    In November 2001, Simpson was injured at work when a screwdriver hit her in the shoulder and lip.  Simpson I Dep. 174-175.  Moore attempted to talk with Simpson about her injury.  Simpson did not follow UPSCO's required standard process for reporting workplace injuries, decided not to seek medical treatment, and left work.  Simpson I Dep.

176-177.  Simpson admits she did not ask for permission to leave, but claims she told Moore she was leaving and he did not say she could not so.  Moore called Simpson at home later that day, but she refused to discuss the incident with him.  Simpson I Dep. 177-178.

11.    After the incident, Simpson received a warning letter for insubordination, leaving work without approval, and failing to follow safety procedures.  Simpson I Dep. 180-181 and Ex. 14.

12.    In February 2002, Simpson was working to repair a broken wire on an aircraft that was close to being late to depart.  Jeffrey Allums ("Allums"), another mechanic, was helping her.  Simpson I Dep. 201; Allums Dep. 26-27.  Underwood approached Simpson in the parts room and asked her twice what was wrong with the airplane.  Simpson did not like the way Underwood was standing and the inflection in his voice and she stated "Rock, f–k you," threw the tools on the shelf, left the parts room, and did not inform Underwood about the status of the aircraft.  Simpson I Dep. 203-205; Allums Dep. 28-29; Underwood Decl., Para. 13.  Underwood followed Simpson and told her to sit in his office.  Simpson again told Underwood "f—k you," and refused to go to his office.  Simpson I Dep. 205; Underwood Decl. 13.  Underwood asked what was wrong with the airplane, but Simpson did not respond.  Simpson I Dep. 205-206; Underwood Decl., Paras. 13-14.  After a disciplinary hearing was held, Simpson was given a two-week suspension as a result of the incident.  Simpson I Dep. 214 and Ex. 17; Field Decl., Para. 4 and Ex. A; Cryer Decl., Para. 11; Underwood Decl., Para. 15.

13.     In her opposition memorandum, Simpson claims that Underwood interfered with the work she and Allums were doing to get the plane repaired by launching into a tirade against her and blocking her way out of the office. She further claims that "[w]hile Underwood readily assists male employees, he prefers to antagonize [her]." Plaintiff's Opposition Memorandum, at 3.

14.     On September 24, 2002, an unexpected extra airplane arrived at the Columbia Gateway which was already short two mechanics. Simpson I Dep. 232-233; Allums Dep. 39, 41-42; Wendell Smith Decl., Para. 6; Underwood Decl., Para. 16. Simpson received a call that a B757 approximately 300 feet away was ready to be dispatched and she left the plane she was working on (with Underwood and two other mechanics) and drove to the B757 to dispatch the aircraft. Upon arriving at the B757, Simpson discovered that it had an external airstart[4] connected to it. At the time, there were approximately six ground personnel in the immediate vicinity of the B757, including James Gasaway and James Whitesell. Simpson Dep. 1 242, 261; Underwood Decl., Para. 20. Both of these men were experienced ground personnel that had worked at the Columbia Gateway with Simpson for years. Simpson Dep. 261. Gasaway and Whitesell were among the ground

---

[4]Dispatching an aircraft is a procedure where a mechanic or designee (non-mechanic who is trained and certified to handle certain equipment on the air ramp, including the operation of a ground airstart unit) assists the flight crew in starting the aircraft for a normal gateway departure. Underwood Decl., Paras. 6-7. Starting an aircraft engine involves the use of its Auxiliary Power Unit ("APU"). Underwood Decl., Para. 5. If an aircraft does not have an operational APU, then assistance is necessary in the form of a ground airstart unit. Simpson I Dep. 84-86; Allums Dep. 17-18; Smith Decl., Para. 3; Underwood Decl., Paras. 5 and 7. Dispatching aircraft with a deferred APU is a fairly common practice industry-wide and each mechanic at the Columbia Gateway is expected to be familiar with this procedure. Ramlogan Dep. 18-19; Underwood Decl., Para. 7; Smith Decl., Para. 3.

support personnel trained and certified to handle airstart operations.  Allums Dep. 22-23; Underwood Decl., Para. 21.

15.    A ground airstart operation typically involves two people.  UPSCO asserts that this can be done with at least one mechanic and another person who may be a designee, although it is not uncommon for another mechanic to assist in performing the task.  Underwood Decl., Para. 9; Smith Decl., Para. 4.  They further assert that there is no UPSCO policy or Federal Aviation Administration ("FAA") rule or regulation requiring that two mechanics perform this procedure or that prevents a mechanic from using a designee to assist.  Underwood Decl., Para. 9; Allums Dep. 21; Gilbert Ramlogan Dep. 21; Smith Decl., Para. 4.  UPSCO also asserts that this procedure is consistent with UPS's Ground Operations Manual ("GOM").  Underwood Decl., Paras. 8-9.  Simpson had used ground operations personnel to assist her in utilizing an external airstart on other planes at least three times, and had observed ground personnel assisting other mechanics with external airstarts at least a dozen times.  Simpson I Dep. 110-111.

16.    Simpson called over her radio to other mechanics requesting assistance in starting and operating the airstart.  Simpson I Dep. 242-244; Underwood Decl., Para. 18.  Underwood responded by radio and instructed Simpson to dispatch the B757 herself, because the other mechanics were busy.  Simpson I Dep. 244-246, 248-249; Underwood Decl., Para. 19.  Simpson got on the headset and informed the flight crew that she needed assistance, and that the flight crew should notify flight operations that there would be a problem because her supervisor refused to help her.  Simpson I Dep. 254, 256, 258.  Simpson did not ask

Gasaway, Whitesell, or any other available ground crew personnel for assistance in dispatching the aircraft. Simpson I. Dep. 261-262; Underwood Decl., Para. 21.

17.   After Underwood realized the B757 had not departed and was late, he ran over to the aircraft, pointed his finger about a foot from Simpson's face, and yelled to Simpson that she needed to depart the aircraft utilizing ground operations personnel. He offered to show her the procedure step-by-step, if necessary. Simpson I Dep. 266-270; Underwood Decl., Para. 20. Simpson did not express concern about whether the available ground crew personnel were qualified and did not indicate that what he was asking her to do was unsafe. Simpson I Dep. 270-271; Underwood Decl., Para. 21. In response to Underwood's instructions, Simpson made no effort to start the engine and dispatch the plane, turned her back on Underwood repeatedly, and refused to follow his instructions. Underwood Decl., Para. 20. After a few minutes, Underwood unplugged Simpson's headset, handed it to her, and told her he no longer needed her. She handed the headset back to him and walked away. Simpson I Dep. 272; Underwood Decl., Para. 20. The B757 incurred an actual delay of eight minutes and a total time loss in dispatch of fifteen minutes. Underwood Decl., Para. 22.

18.   Simpson claims that Underwood should have offered to help her, but instead "offered only irony and antagonism." Plaintiff's Opposition Memorandum at 4. She also claims that if a supervisor is present, the mechanic is supposed to go through the supervisor and "it is more the responsibility of the supervisor to ask the ground crew for help." Id. at 5. She also claims that "there is no way for a mechanic to know who [of the ground crew] is qualified and who isn't." Id.

19.  Field stated that as a result of this incident, as well as Simpson's past suspension for insubordinate and unprofessional behavior, he made the decision to terminate Simpson's employment.  Field Decl., Para. 5 and Ex. B.  <u>See</u> Simpson I Dep. 281-282, Ex. 19.

20.  Throughout her employment, Simpson was a member of the International Brotherhood of Teamsters (the "Teamsters").  The Teamsters represent UPSCO mechanics.  The terms and conditions of Simpson's employment were governed by a collective bargaining agreement between UPSCO and the teamsters (the "Contract").  Subsequent to her termination, Simpson availed herself of the grievance procedure set forth in the Contract by filing four separate grievances based on her termination.  UPSCO denied the grievances and the Teamsters elected to appeal to arbitration only the grievance alleging that UPSCO terminated Simpson without just cause in violation of the Contract.  Cryer Decl., Paras. 14 and 16; Simpson Dep. 330 and Defendant's Ex. 31.

21.  On October 1, 2002, Simpson filed a claim with the South Carolina Department of Labor, alleging that she had been required to perform an unsafe procedure.  The claim was referred to the FAA which informed Simpson that it had investigated her complaint, reviewed UPSCO's GOM, and found that Underwood had followed the GOM and there was no violation of FAA Regulations.  Simpson filed another complaint.  The FAA informed Simpson that three FAA inspectors observed another B757 dispatched with an inoperative APU and believed that the instructions Simpson received were neither unsafe nor contrary to UPSCO's manual.  The FAA concluded that it would not be unsafe or contrary to UPSCO procedures for a mechanic to dispatch a B757 in the manner that Underwood instructed.  Simpson I Dep. 284, 286, 288-292, 296-297 and Ex. 24.

22.     On December 12, 2002, Simpson filed a Charge of Discrimination with the South Carolina

Human Affairs Commission ("SCHAC") and the Equal Employment Opportunity

Commission ("EEOC").  Simpson II Dep. Ex. 43.

23.     An arbitration hearing was held before the System Board of Adjustment ("SBA")[5] on April

14, 2003.  On September 12, 2003, the arbitrator concluded that UPSCO demonstrated just

cause for taking disciplinary action against Simpson for insubordination on September 24,

2002.    Although the arbitrator found that Simpson's "insubordinate behavior was

unjustified and she played the major role in escalating the situation which ended in her

discharge," she also found that Underwood bore some responsibility for the events because

he lost his temper.  The arbitrator exercised discretion to modify the penalty imposed on

Simpson from discharge to a suspension without pay, and reinstated Simpson without back

pay effective September 12, 2003.  Simpson returned to work at UPSCO on September 17,

2003.  Simpson I Dep. 336; Ex. 32; Cryer Decl., Para. 18.

<u>DISCUSSION</u>

Simpson alleges claims for discrimination on the basis of her sex.  UPSCO argues that it

is entitled to summary judgment because Simpson cannot establish a prima facie case as to any of

her claims.

---

[5]The SBA consists of two UPSCO and two Teamster representatives.  In the event that the SBA "deadlocks" and is unable to resolve a dispute, an impartial arbitrator is selected by the parties, who joins the SBA and presides over an arbitration of the matter.  The decision of the SBA is final and binding on the Teamsters, the employee, and UPSCO.  Cryer Decl., Para. 15.

A.     Disparate Treatment

Simpson appears to allege that she was subjected to disparate treatment (including termination, disparate discipline, and other adverse actions) based on her gender in violation of Title VII.   UPSCO argues that Simpson fails to establish a prima facie case and that it has articulated a legitimate, non-discriminatory reason for its actions that she fails to show is pretextual.

1.     Termination

UPSCO argues that Simpson fails to establish a prima facie that she was discharged because of her gender because she was not performing her job satisfactorily at the time of her termination.   The company argues that even if Simpson can establish a prima facie case, it has articulated a legitimate, non-discriminatory reason for her termination that she fails to show is pretextual.

A plaintiff can employ the scheme outlined in McDonnell Douglas v. Green, 411 U.S. 792 (1973) to establish a prima facie case of discrimination.[6]   To establish a prima facie case of

---

[6]In her memorandum in opposition to summary judgment, Simpson argues that this action should proceed to a jury trial because the ultimate question of whether Simpson was a victim of intentional discrimination is "a factual issue that is hotly disputed between the parties and one on which reasonable minds could differ." Plaintiff's Opposition Memorandum at 7.  She argues this based on the decision in Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003).  In that case, the United States Supreme Court held that a plaintiff proceeding under a mixed-motive theory of discrimination is not required to establish his or her prima facie case by direct evidence.  In its first post-Desert Palace decision on employment discrimination, the United States Court of Appeals for the Fourth Circuit discussed at length both the pretext framework and the mixed-motive theory of unlawful discrimination.  See Hill v. Lockheed Martin Logistics Mgmt., 354 F.3d 277 (4th Cir. 2004).  The Fourth Circuit, recognizing that Desert Palace removed the burden of proving a mixed-motive case by direct evidence, held that:

> Regardless of the type of evidence offered by a plaintiff as support for her discrimination claim (direct, circumstantial, or evidence of pretext, or whether she

(continued...)

discriminatory discharge, a plaintiff must show: (1) he is a member of a protected class; (2) he was qualified for his job and his job performance was satisfactory; (3) he suffered an adverse employment action; and (4) that the position remained open to similarly qualified applicants after his dismissal (or that the position was filled by a similarly qualified applicant outside the protected class). See Karpel v. Inova Health Sys. Servs., 134 F.3d 1222, 1228 (4th Cir. 1998); Brinkley v. Harbour Recreation Club, 180 F.3d 598, 607 (4th Cir.1999). McDonnell Douglas requires that, once a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory basis for the challenged employment action. McDonnell Douglas, 411 U.S. at 802. If the employer provides the required evidence of a non-discriminatory reason for the action, the plaintiff must then show that the proffered reasons were not the true reasons for the employment action, but were a pretext for discrimination. Id. at 804; see also Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147 (2000).

UPSCO argues that Simpson cannot establish a prima facie case of discriminatory termination because she had three prior write-ups for insubordination and then engaged in insubordination on the night of September 24, 2002, that led to her termination. Simpson has not

---

[6](…continued)
proceeds under a mixed-motive or single-motive theory, "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination."
Hill, 354 F.3d at 286 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 153 (2000)).
Simpson's argument should be rejected because she failed to plead a mixed-motive theory in her Complaint. Further, she has failed to present sufficient evidence for a reasonable jury to conclude by a preponderance of the evidence that her gender was a motivating factor for any prohibited employment practice.

provided anything to dispute this, other than arguing that Underwood should have helped her during the September 2002 incident.

Even if Simpson could establish a prima facie case, UPSCO has articulated a legitimate, non-discriminatory reason for its actions (Simpson's insubordinate conduct in September 2002 coupled with her multiple prior incidents of insubordination). The company argues that its reasons are supported by the arbitration panel's decision. Simpson claims that her termination "was not legitimate or based on neutral criteria. The arbitration panel did not hear the whole story. It did not hear all of the witnesses nor all the issues." Plaintiff's Opposition Memorandum at 8. She appears to argue pretext, claiming it was not possible for her to depart the B757 plane by herself on September 2002. She also appears to argue gender based animus because Underwood referred to her behavior as childish.

Simpson fails to show that UPSCO's legitimate, non-discriminatory reason for terminating her employment is pretextual or that discrimination was the real reason for its actions. She fails to show that a reference to her behavior as childish is indicative of gender based animus. Further, merely questioning the merits of UPSCO's decision does not show that the articulated reason for terminating Simpson was false or was not the real reason for her discharge. See, e.g., Hawkins v. PepsiCo, Inc., 203 F.3d 274 (4th Cir. 2000); Kun v. Berkeley County Gov't, 214 F.Supp.2d 559, 566 (D.S.C. 2001), aff'd, 32 Fed. Appx. 689, 2002 WL 570670 (4th Cir. Apr. 17, 2002).

2.    Disparate Discipline

Simpson also fails to establish a prima facie case of disparate discipline.[7]

In order to establish a prima facie case of disparate discipline, a plaintiff must prove that:

(1) she is a member of a protected class under Title VII;

(2) the prohibited conduct in which she engaged was comparable in seriousness to misconduct of employees outside the protected class; and

(3) she suffered more severe discipline for his misconduct as compared to those employees outside the protected class.

See Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir. 1993); Moore v. City of Charlotte,

754 F.2d 1100, 1105-06 (4th Cir.), cert. denied, 472 U.S. 1021 (1985).

Simpson fails to show that she was subjected to disparate discipline because she has not

shown that she was similarly situated to the other employees who she claims were better treated.

In making a comparison of a plaintiff's treatment to that of employees outside the protected group,

a plaintiff must show that the comparables are similarly situated in all relevant respects.  See

Mitchell v. Toledo Hospital, 964 F.2d 577 (6th Cir. 1992); see also Linear v. Safeway Grocery,

843 F.2d 298 (8th Cir. 1988)(plaintiff must prove that he and non-protected employee were

similarly situated in all respects and the other employee's acts were of comparable seriousness to

his own); see also Heyward v. Monroe, 166 F.3d 332, 1998 WL 841494 (4th Cir. Dec. 7,

1998)(unpublished)(employees similarly situated only if they "dealt with the same supervisor,

---

[7]Simpson, in her memorandum in opposition to summary judgment, states that "[t]he adverse disciplinary actions taken against the Plaintiff are indicative of the differential treatment she received as a female mechanic.  They are not the basis for a separate claim of discrimination."  Plaintiff's Opposition Memorandum at 10.  She, however, continues to discuss numerous incidents in her memorandum in which she appears to allege disparate discipline.  Thus, these alleged incidents are discussed below.

[were] subject to the same standards and...engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." (citations omitted)), cert. denied, 527 U.S. 1036 (1999); Smith v. Stratus Computer, Inc., 40 F.3d 11 (1st Cir. 1994)(in disparate treatment cases, employees must be similar in "all relevant aspects" including performance, qualifications, and conduct)(citation omitted), cert. denied, 514 U.S. 1108 (1995); see also Bogren v. Minnesota, 236 F.3d 399, 405 (8th Cir. 2000)(finding that probationary and non-probationary employees are not similarly situated), cert. denied, 534 U.S. 816 (2001).

Simpson asserts that another employee, Paul McCahey ("McCahey")[8] was caught drinking alcohol on the job and was less severely disciplined than Simpson. This incident appears to have occurred well before the time frame encompassed by this action.[9] Further there is no indication that McCahey was similarly situated to Simpson. McCahey was disciplined by a different supervisor (Jeff White) than Simpson and there is no indication that McCahey had a history of multiple prior write-ups for insubordination similar to that of Simpson. See Simpson II Dep. 109-112.

Simpson alleges that she advised Moore she could not attend the training class in Louisville, Kentucky, but she was not given the consideration normally afforded similarly-situated males and was instead written up for insubordination and given one week off without pay. She

---

[8]McCahey apparently failed to clock out from work, went fishing at a pond on the airport property, and was "picked up" by the police for drinking. Simpson II Dep. 107-109.

[9]Simpson did not remember the date, but stated that it had been "a while" since this incident happened. To pursue a claim, a plaintiff must have filed a complaint with the EEOC within 180 days of the incident or within 300 days of the incident if state or local proceedings are initiated. 42 U.S.C. § 2000e-5(e)(1). This allegation appears to be a discrete act that is not part of a continuing violation. See National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002).

has not, however, identified any other employee who refused to attend scheduled training, and/or refused to provide an explanation in support of a request to reschedule who was treated more favorably.  See Simpson I Dep. 138, 141.

Simpson also alleges that the night of September 24, 2002, Underwood was yelling at mechanic Wendell Smith ("Smith") concerning Smith jumping from job to job, but Underwood later apologized to Smith.  Simpson fails to show that she and Smith were similarly situated.  In response to questions of whether Smith turned his back on Underwood or refused to obey an order from Underwood, Simpson replied, "not that I know of."  Simpson II Dep. 125-126.[10]

Additionally, Simpson alleges that other employees did not have to "punch out" for lunch, but she had to do so.  She, however, admits that she received no disciplinary measures relating to this allegation.  Simpson II Dep. 114.

3.    Other Alleged Disparate Treatment Actions

Simpson also appears to allege disparate treatment on the basis of her gender in that her male supervisors failed to afford her the same consideration and privileges afforded to male mechanics in the terms and conditions of her employment and she was provoked by male supervisors who would utilize her reaction as pretext to discipline her.  She alleges specifically that she was not afforded the help, assistance, and cooperation given to male aircraft mechanics;  when she was initially transferred to the Columbia Gateway her supervisor (Garcia) refused for a year to purchase a second uniform jacket for her while similarly-situated male aircraft mechanics were

---

[10]In her opposition memorandum, Simpson also alleges that she was "removed" from overtime and her overtime job was given to a white male.  She also alleges that Underwood constantly followed and watched her.  Review of the cited deposition testimony (Simpson II Dep. 28-29 and 112-113), however, reveals that these alleged events occurred after this action was filed, and the incidents are not the subject of this action.

provided with two uniform jackets.  In her opposition memorandum, she also appears to allege that Underwood constantly followed and watched her.  UPSCO argues that Simpson fails to establish that she was subjected to any adverse employment actions other than termination.

A plaintiff can establish a prima facie case of disparate treatment by offering proof that:

(1)    she is a member of a protected class;

(2)    she was qualified for her job and her job performance was satisfactory;

(3)    she was subjected to an adverse employment action; and

(4)    other employees who are not members of the protected class were treated more favorably.

See Gairola v. Commonwealth of Virginia Dep't of General Serv., 753 F.2d 1281, 1286 (4th Cir.1985); Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir.), cert. denied, 516 U.S. 870 (1995); McDonnell Douglas, 411 U.S. at 802.

Simpson fails to establish a prima facie case as to these alleged actions because she has not shown that the alleged incidents constituted adverse employment actions.  She has not shown that these alleged actions affected the terms, conditions, or benefits of her employment.  See Page v. Bolger, 645 F.2d 227, 233 (4th Cir.), cert. denied, 454 U.S. 892 (1981); Von Gunten v. Maryland, 243 F.3d 858, 868 (4th Cir. 2001).

B.    Harassment/Hostile Environment

In her Complaint, Simpson has not specifically alleged a harassment/hostile environment claim, alleging only a first cause of action for discrimination on the basis of sex and a second cause of action for wrongful termination.  UPSCO argues that Simpson failed to allege a gender-based harassment claim in her Complaint, but if such a claim is considered she fails to

establish a prima facie case of harassment. In her memorandum in opposition to summary judgment, Simpson argues that the conditions she was subjected to go far beyond mere incivility and states that she has been undergoing counseling for job-related stress. She also appears to argue that even if, as suggested by UPSCO, there was a personality conflict between Underwood and Simpson as a "stubborn mechanic," Underwood seemed to get along with male "stubborn mechanics." Plaintiff's Opposition Memorandum at 10.

To prevail on a Title VII hostile environment claim based on gender, a plaintiff is required to present evidence establishing that "(1) the subject conduct was unwelcome; (2) it was based on the [gender] of the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer." Spicer v. Virginia Dep't of Corrections, 66 F.3d 705, 710 (4th Cir.1995) (en banc); see also Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331 (4th Cir.2003) (en banc), cert. denied, 540 U.S. 1177 (U.S. 2004).

Simpson cannot establish a prima facie case of gender-based harassment because she fails to show that the alleged harassment was sufficiently severe or pervasive to create an abusive working environment. Other than a couple of claims discussed below, Simpson has merely made general assertions that she was subjected to harassment and that there was an attitude by some men that women did not belong in the field of aviation.[11] She alleges that in approximately June 2000,

---

[11]Although Simpson cites to Stephen Ross's deposition for this proposition, the page cited (41) does not contain anything about the general perception of women in the aviation industry, but does contain information that Ross never heard Underwood make any gender-related comments in the workplace and did not see Underwood engage in any behavior suggestive of gender animus. Ross Dep. 41-42. Allums testified that some men in aviation were "of the old school" and believed "women d[idn't] belong in aviation," but stated he never heard such a statement from Underwood or heard Underwood make any gender-related remarks. Allums Dep. 99-100.

Collette left an e-mail on the break table that contained a sexist joke.  Simpson I Dep. 199-200;

Simpson II Dep. 160-161 and Ex. 45.  Additionally, she alleges that Underwood told Allums that

"he [Underwood] didn't need someone like her [Simpson] there."  Allums Dep. 99.

In Faragher v. City of Boca Raton, 524 U.S. 775 (1998), the Supreme Court reaffirmed

its previously articulated standard for determining when a plaintiff has established a hostile work

environment in violation of Title VII, stating that a plaintiff must establish that the environment

was "both objectively and subjectively offensive, one that a reasonable person would find hostile

or abusive, and one that the victim in fact did perceive to be so." Faragher, 524 U.S. at 787

(citing Harris v. Forklift Systems, Inc., 510 U.S. 17, 21-22(1993)).  Actionable sexual harassment

occurs when the workplace is "permeated with discriminatory intimidation, ridicule, and insult."

Harris, 510 U.S. at 21.  Title VII does not reach "genuine but innocuous differences in the ways

men and women routinely interact with members of the same sex and of the opposite sex… [I]t

forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's

employment." Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75  (1998), citing, Harris

510 U.S. at 21.

Among the circumstances examined are "the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work performance." Harris v. Forklift

Sys., Inc., 510 U.S. at 21.  "While we do not approve of [the employer's] apparent willingness

to offend and provoke employees with his ambiguously sexual innuendos, Title VII was not

designed to create a federal remedy for all offensive language and conduct in the workplace." Id.

at 754; see also Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir.1995) ("The concept

20

of sexual harassment is designed to protect working women from the kind of male attentions that can make the workplace hellish for women…It is not designed to purge the workplace of vulgarity.").

Further, Simpson has not shown that the alleged harassment (other than the joke) was based on her gender. In January 2000 she complained that she was subjected to a pattern of harassment "for no apparent reason." Simpson I Dep. Ex. 11. She testified that perhaps Underwood just liked other mechanics more than he liked her. Simpson I Dep. 229.

<u>CONCLUSION</u>

Based on the foregoing, it is recommended that Defendant's motion for summary judgment (Doc. 23) be granted.

Respectfully submitted,

s/Joseph R. McCrorey
United States Magistrate Judge

May 24, 2005
Columbia, South Carolina